# EXHIBIT D

MUSICK, PEELER & GARRETT LLP
ATTORNEYS AT LAW
650 TOWN CENTER DRIVE, SUITE 1200
COSTA MESA, CALIFORNIA 92626-1925
TELEPHONE (714) 668-2400
FACSIMILE (714) 668-2490

Donald E. Bradley (State Bar No. 145037)
d.bradley@mpglaw.com

Attorneys for Defendant PENNSYLVANIA HIGHER
EDUCATION ASSISTANCE AGENCY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ERIN C. JONES,<br><br>       Plaintiff,<br><br>    vs.<br><br>PENNSYLVANIA HIGHER<br>EDUCATION ASSISTANCE<br>AGENCY; EQUIFAX<br>INFORMATION SERVICES, LLC;<br>EXPERIAN INFORMATION<br>SOLUTIONS, INC.; TRANS UNION,<br>LLC; and DOES 1 to 10, inclusive,<br><br>       Defendants. | Case No. 2:16-cv-00107 RSWL (AFMx)<br><br>Hon. Ronald S. W. Lew, Courtroom 21<br><br>**PENNSYLVANIA HIGHER<br>EDUCATION ASSISTANCE<br>AGENCY'S DISCLOSURE OF<br>EXPERT WITNESS<br>INFORMATION PURSUANT TO<br>FRCP RULE 26(a)(2)** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

    Pennsylvania Higher Education Assistance Agency ("PHEAA") hereby submits the following expert witness who may be called to testify at the trial of this matter pursuant to Federal Rules of Civil Procedure Rule 26(a)(2)(B):

1031417.1

Case No. 2:16-cv-00107 RSWL (AFMx)

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY'S DISCLOSURE OF EXPERT WITNESS
INFORMATION PURSUANT TO FRCP RULE 26(a)(2)

1  **RETAINED EXPERT:**

2      John Ulzheimer

3      Ulzheimer Group LLC
    1160 Buckhead Valley Court,

4      Atlanta, GA 30324

5      Phone:  (404) 636-3737

6      Mr. Ulzheimer's *curriculum vitae* and expert's report are attached hereto as

7  **Exhibit A**.

8      Mr. Ulzheimer will testify on those matters more fully described in the

9  attached report, which generally address the following:

10      1.    The reasonableness of PHEAA's procedures in furnishing Plaintiff's

11  account information to credit reporting agencies;

12      2.    The reasonableness of PHEAA's procedures in responding to disputes

13  of account information both directly from Plaintiff and as forwarded from credit

14  reporting agencies;

15      3.    Plaintiff's lack of financial damage caused by any conduct by PHEAA.

16      In accordance with Federal Rules of Civil Procedure Rule 26, PHEAA

17  reserves the right to supplement this disclosure and report in the event additional

18  discovery is produced by Plaintiff.

19      Further, PHEAA reserves the right to call any and all expert witnesses

20  designated by any other party in this case.

21

22  DATED:  February 10, 2017    MUSICK, PEELER & GARRETT LLP

23

24

25      By: _____

26      Donald E. Bradley
    Attorneys for Defendant PENNSYLVANIA

27      HIGHER EDUCATION ASSISTANCE
    AGENCY

28

MUSICK, PEELER
& GARRETT LLP
ATTORNEYS AT LAW

1031417.1    2    Case No. 2:16-cv-00107 RSWL (AFMx)
PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY'S DISCLOSURE OF EXPERT WITNESS
INFORMATION PURSUANT TO FRCP RULE 26(a)(2)

# EXHIBIT A

# Expert Report of John Ulzheimer

### Erin Jones v PHEAA, et al.

**February 10, 2017**

## I.  QUALIFICATIONS

### A.  Employment History

I have worked in the consumer credit industry since November of 1991. I spent six years with Equifax Credit Information Services and spent several of those years managing a team of consumer service agents, handling thousands of consumer calls annually. My team and I also handled the process of logging consumers' credit-related disputes, the generating of the appropriate dispute forms, manual verification, credit report corrections, and disclosures to consumers. While at Equifax, I gained an intimate understanding of how credit files are compiled, stored, retrieved, and delivered. I also sold various Equifax Credit Marketing Services ("CMS") products, which included lists for preapproved credit card offers.

At FICO (formerly known as Fair Isaac Corporation and best known for its FICO credit scores), I spent an additional seven years gaining an intimate understanding of credit scoring, including how credit scores are designed, developed, used by lenders, and impacted by the information in consumer credit files. From time to time, I was involved with the development of FICO credit bureau scorecards, which are the heart of credit scores.

At Credit.com, I spent six years teaching consumers and the media how the consumer credit system works, including topics such as credit reporting, credit scoring, credit cards, and debt settlement, to name but a few. I was also the developer of the Credit Report Card, a credit-scoring tool that interprets Trans Union credit data as a credit-scoring model would, which then gives the consumer an easy to understand summary of their credit risk. The tool won several awards in 2009 when it was released.

As a former employee of Equifax, Fair Isaac, and Credit.com, I have worked with, helped train, and supervised employees on processes and procedures involved in credit reporting, credit report dispute resolution, Fair Credit Reporting Act compliance, credit score model design and development, and consumer credit risk management.

I am also familiar with general underwriting practices, including what prospective lenders consider when determining credit risk. This includes a general understanding of what lenders consider important, and not so important, when considering a consumer's credit report. I gained this knowledge from many years of working with various lenders during my employment with Equifax, Fair Isaac, and Credit.com. In fact, during the first four years of my time at Fair Isaac, I taught members of the mortgage industry how to properly implement credit scoring into their processes. At the time, Fannie Mae and Freddie Mac had just mandated the use of FICO scoring in their two desktop underwriting systems, Loan Prospector and Desktop Underwriter. My role, among other things, was to teach industry trade associations, large national mortgage lenders, Fannie Mae, and Freddie Mac how FICO scoring worked, how consumer risk changed as deal variables changed, and how to educate their home-buying customers on the importance of solid credit management.

### B.    Presentations and Academia

I have made hundreds of credit reporting and credit scoring presentations during my time working in the credit industry. These presentations were delivered to consumers, consumer groups, credit counselors, credit reporting agencies, nationally recognized lenders, members of the press, members of Congress, and banking authorities, and were of varying levels of complexity depending on the audience.

I frequently guest lecture about credit reporting and credit scoring at both The University of Georgia and The Westminster Schools in Atlanta. I have also taught at Emory University's Center for Lifelong Learning, where I was rated by the students as the top instructor in the Personal Finance and Investments category during the 2005-06 term. In April 2016 I began guest lecturing to 2nd and 3rd year students at the Emory University School of Law. I also volunteer my time teaching credit reporting and credit scoring fundamentals to members of the Georgia Consortium on Personal Financial Literacy.

I received a Bachelor of Science in Criminal Justice from the University of West Georgia in June 1991. I am well qualified to interpret and discuss the issues at hand in this case. My background and qualifications are set forth in my resume, which is attached as Exhibit A.

### C.    Publications

I am a frequent contributor on consumer credit issues to USA Today, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Washington Post, Money Magazine, American Banker, SmartMoney, MarketWatch, CNN.com, MSNBC.com, Bankrate.com, and other regional business and consumer media outlets.

I have written the following books and training manual on the same topics, including *You're Nothing but a Number* (2007), *The GetCreditWise Tool Kit* (2007), *Surviving Identity Theft* (2007 w/ Emily Peters), and my most recent book, *The Smart Consumer's Guide to Good Credit: How to Earn Good Credit in a Bad Economy* (2012). I also published an article, *CARD Act, the good the bad and the meaningless*, in the March 2010 issue of Bank and Lending Liability Report.

I have been a full time author since late 2004 and the number of my publications to date is approximately 3,500. I currently write or have written regular articles on credit issues for newsletters, website publications, and blogs, including a monthly column, "Ask John," for Credit.com's monthly e-newsletter, *Tidbits*, for Boardroom, Inc.'s monthly newsletter, *BottomLine Personal*, and for CreditBloggers.com, Credit.com, Enloop.com, CNBC.com, IMS Expert Services Newsletter, Mint.com, SmartCredit.com, CreditSesame.com's blog, the National Foundation for Credit Counseling's Financial blog, Credit Card Insider, Sky Rocket Media, The New York Times, JD Byrider's blog, MagnifyMoney, The Simple Dollar, and VantageScore Solutions.

### D.    Certifications

Twice, I have been Fair Credit Reporting Act ("FCRA") certified by the credit reporting trade association, the Consumer Data Industry Association ("CDIA"), and its predecessor, the Associated Credit Bureaus ("ACB"). The FCRA Certificate Program was developed to prepare

consumer reporting agencies and companies that furnish information to the consumer re-
porting agencies to meet the requirements set forth in the FCRA. The course covers how
consumers, credit grantors, and those who use and furnish information to consumer re-
porting agencies are affected by the FCRA.

### E.    Previous Expert Witness Work and Testimony

I have served as an expert witness in more than 260 lawsuits concerning credit issues and
have been qualified to testify as an expert in both federal and state courts. I have served as
an expert for both plaintiffs and defendants, and for creditors and consumers. A list of mat-
ters on which I have testified in the last four years is attached as Exhibit B to this report.

## II.    SCOPE OF WORK

I was retained by counsel for Defendant Pennsylvania Higher Education Assistance Agency
("PHEAA") and asked to provide expert opinions on credit reporting and credit scoring gen-
erally. I was also asked to provide expert opinions regarding PHEAA's credit reporting of
Plaintiff's student loan ("subject loan"), Plaintiff's alleged damages, and offer other opin-
ions as summarized herein.

## III.   COMPENSATION

I am being paid my typical rate of $425 per hour for all work performed. I have no financial
interest in the outcome of this matter.

## IV.    DOCUMENTS REVIEWED

A list of documents and other information upon which I have considered and relied in form-
ing my opinions set forth in this Report is attached as Exhibit C.  I understand that discov-
ery is ongoing in this case, and I anticipate reviewing additional documents as discovery
progresses.

## V.     SUMMARY OF OPINIONS

Having reviewed the facts and materials in this case and based on my analyses presented in
this Report, it is my opinion that:

- Plaintiff was, in fact, liable for the subject loan. As such, credit reporting and
  subsequent verification of the subject loan is perfectly reasonable.

- PHEAA performed reasonable investigations in response to the Plaintiff's credit
  reporting disputes.

- There is no evidence the Plaintiff suffered any economic damages as a result of
  PHEAA's furnishing of credit information to the credit reporting agencies.

## VI.    STATEMENT OF OPINIONS AND BASIS FOR OPINIONS

### A.    Background regarding the credit reporting industry

#### 1.    Credit Reporting Agency Background

A credit report is a record of an individual's current and past financial liability experience. The report includes information about a consumer's personal identity, their employment, collection agency accounts (if any), public records (liens, judgments, and bankruptcies only), as well as their account history (also called "trade"). There are a number of companies that maintain consumer credit files and generate credit reports when requested by the consumer, a lender, an insurer, or another organization with a right to view such data.

These companies are called credit reporting agencies, consumer reporting agencies, or credit bureaus. They collect and store credit data and then generate and deliver credit reports using that data in response, for example, to requests from lenders or insurance companies who have received an application for credit or to bind insurance. There are three major, commonly recognized credit reporting agencies in the United States: Equifax, Experian, and Trans Union. Equifax, a public company, is headquartered in Atlanta, Georgia. Experian, a public company in the U.K., has its U.S. headquarters in Costa Mesa, California. Trans Union, a public company, is headquartered in Chicago, Illinois. Each of the three companies maintains over 200 million credit files. There are roughly 600-675 million consumer credit files in circulation.

#### 2.    Data Furnisher Background

Information that is sent to the credit reporting agencies comes from companies generally referred to as "data furnishers." These companies are almost always going to be some sort of financial institution (e.g., a bank, credit union, finance company, or credit card issuer) or a debt collector. These furnishers will generally send their customer or debtor's account information to the credit reporting agencies once every statement cycle period, which is normally once per month.

The furnisher's information is normally sent to the credit reporting agencies via a magnetic tape or a system-to-system communication system. Once the credit reporting agency receives the furnisher's information, they will load it into their credit file database and disclose it on a consumer's credit report when requested.

The language furnishers use to communicate their customers' or debtors' information to the credit reporting agencies is called "Metro 2." This language is the industry standard. Metro 2 consists of codes and characters which the furnisher uses to populate "cells," or data fields, defined by the credit reporting agencies. The credit reporting agencies display the furnisher's account information on consumer credit reports and disclosures.

Every year the Consumer Data Industry Association ("CDIA") publishes a manual called the Credit Reporting Resource Guide or, informally, the Metro 2 Manual. This manual, which is approximately 290 pages, contains not only the Metro 2 language field layout but also a comprehensive list of the numerous codes used to report information to the credit reporting agencies, and a description of the conditions or scenarios when the codes should be used.

In short, while the credit-related information comes from the furnisher, the language or codes that are available to the furnisher to communicate that information and the format required for its communication are not controlled by the furnisher.

### 3.    Preparation of Credit Reports

A credit report is normally delivered to the lender, insurance company, consumer service provider or other requesting party when a consumer submits an application for some sort of benefit, such as a home loan, auto loan, credit card, subscription service, or insurance. The requestor or lender, referred to by the credit bureaus as a subscriber or user, submits a request for the consumer credit file. Using proprietary search logic, the credit bureau compiles a credit report using its stored data. This process is virtually instantaneous, giving lenders the ability to make instant credit decisions.

The information in a consumer credit report can be scored using a sophisticated algorithm called a credit-scoring model. The report and credit score are then used by lenders to determine an individual's credit risk. The information in a consumer credit report is not "real time," meaning it is not updated dynamically.

### 4.    Credit Scoring

A credit score is a number that summarizes an individual's credit risk based on a snapshot of his or her credit report at that point in time. A credit score helps lenders evaluate an individual's entire credit report *by estimating his or her likelihood of becoming 90 days late on any credit obligation in the 24 months after the score is calculated*. The most widely used credit scores are FICO scores. Lenders can buy FICO scores from any of the three major credit reporting agencies. FICO develops its scores based on information in the consumer credit files maintained by the credit reporting agencies. A credit score may influence the credit available to the consumer and the terms that lenders offer to the consumer (e.g., interest rate, credit limits). Credit scores can be calculated using different scoring models, although FICO is the standard in the United States, Canada, and other countries that maintain sophisticated credit reporting systems.

### a.    Factors Affecting Credit Scoring

FICO scores take into account a number of credit report components. Those components that contribute to a FICO credit score and the relative weight of each (expressed as a percentage) are:

- 35% – **Payment History**: The presence or lack of negative information
- 30% – **Debt**: How much and what type
- 15% – **Length of Credit History**: How long an individual has had credit
- 10% – **Account Diversity**: The variety of credit experiences
- 10% – **Hard Inquiries**: A record of when an individual's credit report is accessed

**Payment History (35% contribution on the FICO scale)** – A record of negative information can potentially lower a consumer's credit rating or score. In general, risk scoring systems look for any of the following negative events: charge-offs, collections, late payments, repossessions, foreclosures, settlements, bankruptcies, liens, and judgments. Within this category, FICO considers the severity of the negative item (minor derogatory versus major derogatory), the age of the negative items, and the prevalence of multiple negative items.[1]

**Debt (30% contribution on the FICO scale)** – FICO considers the amount and type of debt carried by a consumer. There are three types of debt considered:

> **Revolving debt:** This is credit card, retail card, and some gas card debt. While home equity lines of credit have revolving terms, the bulk of debt considered in this category is unsecured revolving debt incurred on "plastic." The most important measurement from this category is called "Revolving Utilization," which is the relationship between the consumer's aggregate credit card balances and available credit card limits, also called "open to buy." This is expressed as a percentage and is calculated by dividing aggregate credit card balances by aggregate credit limits and multiplying the result by 100, yielding the Revolving Utilization percentage. The higher the percentage, the lower an individual's FICO score likely will be. This is why simply closing credit cards is generally not a good method for improving one's credit score. Closing one or more credit card accounts will reduce an individual's total available credit limit and, in turn, likely increase the individual's Revolving Utilization percentage, unless the cardholder also reduces their outstanding balances as well.

> **Installment debt:** This is debt where there is a fixed payment for a set period of time, such as an auto loan requiring the same payment for 36, 48, or 60 months.

> **Open debt:** This is the least common type of debt. Open debt must be paid in full each month. A certain variety of credit cards require a consumer to "pay in full" each month. The American Express Green card is a common example.

**Length of Credit History (Credit File Age) (15% contribution on the FICO scale)** – The older an individual's credit report, the more stable it likely is. The credit file "age" is determined by looking at (1) the date the oldest account was opened, and (2) the average age of the accounts in the credit file. The age of the credit file is measured from the oldest account's "date opened" field. The average age is calculated using the "date opened" field on all accounts, whether they are currently open or closed.

**Account Diversity (10% contribution on the FICO scale)** – An individual's credit score will benefit from having a diverse set of account types in his or her credit file. Having experience across multiple account types (revolving, auto, mortgage, etc.) benefits an individual's credit score because the individual is proving an ability to manage different types of debt.

---

[1] In the FICO and VantageScore scoring systems, a severe or major derogatory is anything that is currently past due, historically 90 days past due or worse, a public record, a collection, or any account status or narrative that indicates default or severe delinquency (e.g., repossession, foreclosure, settlement, charge-off).

**Hard Inquiries (10%** contribution on the FICO scale) – An inquiry is noted every time a company requests some information from a consumer's credit file. There are several kinds of inquiries that may or may not affect one's credit score. Inquiries that have no effect on the creditworthiness of a consumer (including so-called "soft inquiries") can stay on a credit report for as little as 6 months and are never visible to lenders or credit scoring models. There are several types of soft inquiries:

- Prescreening or promotional inquiries, where a credit bureau may sell contact information to credit card companies, lenders, or insurers for consumers who meet criteria set by the inquirer. Pre-approved credit card offers are mailed to consumers identified through a prescreening or promotional inquiry.

- Creditors check current customers' credit files on a periodic basis through an account management, account maintenance, or account review inquiry.

- When a consumer checks his or her own credit report it is referred to as a consumer disclosure inquiry.

- Employment screening inquiries.

- Insurance related inquiries.

- Utility related inquiries.

Other types of inquires (known as "hard inquiries") can have an impact on the creditworthiness of a consumer. These inquiries are visible to lenders and credit scoring models. These inquiries usually result from a lender requesting a consumer's credit report when the consumer applies for an extension of credit. Hard inquiries can, but do not always, affect the borrower's credit score. Limiting the number of credit inquiries can help a consumer's credit score.

### b.    Scoring Models

#### i.    Multivariate Systems

Credit scoring models are multivariate, meaning they evaluate a variety of information on a credit report to generate a final score. No single credit item determines an individual's credit score. In fact, the impact of any one item on an individual's credit score is dependent on all of the other items on his or her credit report.

#### ii.    Multi-Scorecard Systems

Credit scoring models are actually a consolidation of multiple credit scoring systems called scorecards. A scorecard is a credit scoring model designed to evaluate the risk of a group of consumers who have certain similarities in their credit file (homogenous populations). For example, a consumer with a bankruptcy on his credit report is scored using a model or scorecard designed specifically to evaluate the credit risk of consumers who have filed bankruptcy. Similarly, a consumer with limited credit information (known as a "thin file") is scored using a model or scorecard designed to evaluate the credit risk of consumers with thin files. Most credit scoring systems have many scorecards, as there are many unique consumer profiles, each with different risk levels. The selection of the appropriate scorecard is made by the credit scoring system prior to calculating and rendering a final score.

Case 2:16-cv-00107-RSWL-AFM   Document 55-18   Filed 05/12/17   Page 13 of 25   Page ID
#:1234

### iii.    Characteristics, Variables, and Weights

Each scorecard contains a series of characteristics, variables, and weights. A characteristic is a question asked of the credit report by the scoring system. For example, a common characteristic in most credit risk models asks, "how many accounts with a balance are present?" Other examples include:

- Does the consumer have any delinquencies on his or her credit report?
- How long has it been since the consumer's most recent delinquency?
- Does the consumer have a bankruptcy on his or her credit report?

While these examples are plain English questions, credit scoring systems answer the questions by reading the data embedded in the credit report. Scorecards regularly use at least 12 characteristics, and, in some cases, significantly more.

Each characteristic has what are referred to as variables. Variables are the series of available answers to the characteristics (or questions). The set of potential variables (or answers) to the sample[2] characteristics above might be:

- Does the consumer have any delinquencies on his or her credit report?
  (Yes or No)

- How long has it been since the consumer's most recent delinquency?
  (Less than 36 months ago or More than 36 months ago)

- Does the consumer have a bankruptcy on his or her credit report?
  (Yes or No)

And, while these examples are pretty simple ones, most characteristics have a much larger set of available variables.

Once the credit scoring system has completed the process of selecting the scorecard and determining the proper variable for each characteristic in that scorecard, the model assigns weights or points to each variable. For example, the model might assign points as follows:

- Does the consumer have any delinquencies on his or her credit report?
  If the answer is Yes, 0 points are awarded out of 100.
  If the answer is No, 100 points are awarded out of 100.

- How long has it been since the consumer's most recent delinquency?
  If the answer is Less than 36 months ago, 25 points are awarded out of 75.
  If the answer is More than 36 months ago, 75 points are awarded out of 75.

- Does the consumer have a bankruptcy on his or her credit report?
  If the answer is Yes, 0 points are awarded out of 50.
  If the answer is No, 50 points are awarded out of 50.

---

[2] The preceding and following characteristic and variable breakdowns, as well as the weights assigned on this report are EXAMPLES and do not represent the reality of any credit scoring system. These examples are simply meant to illustrate how a credit-scoring model considers information on a credit report.

Once the model has assigned weights or points to each variable, the points are tabulated, resulting in a final credit score. The entire process is computerized and can be accomplished rather quickly. The credit score is usually appended to a credit report and delivered to the lender for use in risk management decisions.

### 5.     How The Data is Used – Risk Based Pricing

Risk-based pricing is a process used by creditors, insurance companies, landlords, retailers, and utility companies ("data users" or "subscribers"). Data users attempt to measure the downside financial risk of doing business with a particular consumer against upside gain if the product being offered to the consumer is priced appropriately. For example, if a consumer presents little risk, a lender can be more aggressive with the interest rate it offers because the consumer's credit score suggests that the consumer will pay on time. If a consumer presents a higher risk, the lender may decline the application or charge a higher interest rate in order to subsidize the risk posed by extending a loan to that consumer. Credit reports and credit scores have become synonymous with credit risk and risk-based pricing.

### 6.     The Dispute Resolution Process

A consumer can challenge information on a credit report by contacting the credit reporting agencies or furnishing party, although the consumer's rights may be different depending on who he or she contacts. A consumer can file a dispute with the credit reporting agencies on their websites, by U.S mail, telephone, or in person.

When a dispute is filed with a credit bureau, several things happen. The item in dispute is marked on the credit report as being "in dispute" by appending a specific code to the disputed item. This Compliance Condition Code[3] is represented by the letters "XB." When an XB code appears next to an item in a credit report, that particular item is excluded from any credit score characteristics that measure payment history or debt until the dispute is resolved or closed and the XB code is removed. This allows the credit reporting agency and data furnisher to conduct the requested investigations without the disputed item impacting the consumer's credit score.

When the dispute is received by the credit reporting agency, a dispute code is assigned. These dispute codes assist the credit bureaus in communicating the type and nature of the dispute to the furnisher and guide (or limit) the investigative actions of the furnisher. For example, dispute code "001" refers to the situation where the "Consumer says [the account is] not his or hers, Provide or confirm complete ID."

These codes and other consumer information is then pre-populated on a form called an Automated Consumer Dispute Verification (ACDV) and sent to the furnisher via a web-based system called Online Solution for Complete and Accurate Reporting or "e-OSCAR." Once the data furnisher receives the ACDV via the e-OSCAR system, they can see the name and identification of the consumer, as well as the nature of the dispute.

---

[3] A Compliance Condition Code ("CCC") is one of the variety of codes in the Metro-2 credit reporting language. According to the Credit Reporting Resource Guide, a CCC "allows the reporting of a condition that is required for legal compliance according to the Fair Credit Reporting Act or the Fair Credit Billing Act."

The data furnisher usually has 30 days to determine if the consumer's dispute requires a modification to his or her credit report or if the challenged item is accurate. Either way, the data furnisher should fill out the "response" portion of the ACDV form with directions to modify the item, delete the item, or leave the item unchanged. The data furnisher's response is sent back the credit bureaus via e-OSCAR. Once the credit bureaus receive the data furnisher's response, they will modify, delete, or do nothing to the entry.

The credit bureau then sends correspondence, usually by mail, to the consumer with the results of the investigation. Under the Fair Credit Reporting Act, this entire process may take up to 45 days, although the Consumer Data Industry Association ("CDIA") reports that the process generally takes less time thanks to automation.

7.  **The Fair Credit Reporting Act, Adverse Action, and Risk Based Pricing Notices and Investigations**

The Fair Credit Reporting Act is the federal statute that defines, among other things, when credit reports can be accessed, consumer's rights, obligations of the credit bureaus and their data furnishers to perform reasonable investigations, and various notice requirements.

For example, when a consumer applies for and is denied a loan or credit card because of information on his or her credit report, including a credit score, the lender is required by the FCRA to provide a notice of adverse action, more commonly referred to as a declination letter. This letter is not optional but is rather mandatory, meaning the applicant does not have to explicitly request the letter after they've been denied.

The notice must contain certain elements including the applicant's credit score, from which credit bureau the lender obtained the credit report, the credit bureau's address, and a notice of a consumer's right to obtain a free copy of their credit report because of the declination.

Further, when a consumer applies for and is adversely approved[4] for a loan or credit card because of information on his or her credit report, including a credit score, the lender is required by the FCRA to provide a Risk Based Pricing notice. This letter, like the adverse action letter, is mandatory. The absence of adverse action or risk based pricing notices means the applicant was approved and given a lender's best available terms.

The FCRA also obligates the credit reporting agencies and their data furnishers to perform investigations when they've been put on notice that the consumer challenges the accuracy of information on their credit reports.  There is no statutory standard of what constitutes a "reasonable" investigation in the FCRA and what is reasonable will depend on the facts and nature of the consumer's dispute.

Most furnishers of information will review the dispute form submitted by the credit bureaus, review their internal records, access multiple systems containing account related information, and will also have access to review any attachments to the dispute that the con-

---

[4] An Adverse Approval is an approval for credit, but not with the lender's best terms.

Expert Report of John Ulzheimer                                                     Page 12

sumer may have included with their communication to the credit bureau(s). This is a com-
mon method of investigation by a furnisher.

    **B.**   **Opinion #1** – Plaintiff was, in fact, liable for the subject loan. As such, credit
    **reporting and subsequent verification of the subject loan is perfectly reasonable.**

The Plaintiff asserts in her Complaint that she is not liable for the subject loan because her
divorce judgment, "...states that Terry Jones (her ex-husband) is solely liable for his consol-
idation loan.[5]" That's not what the divorce judgment states. The divorce judgment states
Terry Jones, "will be responsible for William D. Ford Consolidation loan." Being responsible
for making payments on a loan pursuant to a divorce judgment and truly being liable as an
obligor are two different things.

This is a common misunderstanding in cases of divorce. Many divorcees believe their di-
vorce decrees supersede the terms of the underlying loan documents. This is incorrect. Be-
cause lenders are not normally a party to the divorce judgment they rarely agree to alter
the obligors of a debt or to recognize the terms of divorce agreements as amending under-
lying loan documents or liable parties.

It appears the Plaintiff was, in fact, still liable for the subject loan and her ex-husband, Ter-
ry Jones, was able to have his name removed from the subject loan as an obligor in July
2008[6]. This modification of obligors predates PHEAA's involvement as the subject loan's
servicer by over 5 years[7]. As such, when PHEAA took over servicing of the subject loan in
August 2013 there was only one obligor associated with the debt, Erin C. Jones.

It is entirely reasonable for PHEAA to not only report the subject loan to the Plaintiff's cred-
it reports but also to verify her liability in the cases where she disputed the accuracy of
PHEAA's credit reporting, which she did on several occasions[8].

    **C.**   **Opinion #2** – PHEAA's investigations pursuant to the Plaintiff's credit reporting
    **disputes were reasonable.**

The Plaintiff asserts in her Complaint that, "Defendants have nonetheless repeatedly, delib-
erately, willfully, intentionally, recklessly, and negligently failed to perform reasonable in-
vestigations...[9]" And while it's unclear if the Plaintiff is including PHEAA in this allegation
versus the co-defendant credit reporting agencies (Equifax, Experian and Trans Union),
PHEAA did, in fact, perform reasonable investigations in response to the Plaintiff's disputes.

---

[5] See Complaint, paragraph 18.

[6] See PHEAA/JONES25.

[7] See PHEAA/JONES232-236.

[8] See PHEAA/JONES603, 606, and 608 as examples.

[9] See Complaint, paragraph 42.

In addition to the fact that PHEAA's responses to the Plaintiff's disputes resulted in accurate credit reporting, their investigation procedures are extensive, in depth and fit any definition of reasonable[10].

All of the Plaintiff's disputes claim that she was not liable for the subject loan. These disputes were communicated to PHEAA by the credit reporting agencies via a standardized form called an Automated Consumer Dispute Form ("ACDV")[11]. This form has been used for at least 25 years to facilitate consumer disputes.

PHEAA searched their internal records and confirmed that the Plaintiff was, in fact, the liable party on the subject loan. PHEAA communicated their findings back to the credit reporting agencies using the same ACDV forms, which is the standard process for responding to consumer disputes. There was nothing superficial or insufficient about PHEAA's process as it continued to result in accurate credit reporting.

There is a long chronology of communications between the Plaintiff and the Department of Education ("DOE") that clearly indicates the Plaintiff is liable for the subject loan and that she is, in fact, "responsible for repaying the remaining outstanding balance plus all accrued interest of your loan[12]." There are also communications between the Plaintiff's ex-husband and the DOE indicating that he is not liable for the subject loan[13]. These aforementioned communications go as far back as June 2008, 5+ years before PHEAA begins servicing the Plaintiff's loan.

At some point in time before PHEAA becomes involved with the servicing, the DOE places the subject loan in fraud suspense mode and it is unclear exactly what happened while the loan was in suspense mode. Nonetheless, the DOE decided that the account could be collected from Erin Jones, thus making her a liable party or obligor. As such, it is reasonable for PHEAA to continue to attempt to collect the debt from the Plaintiff and also to continue credit reporting the subject loan in Plaintiff's name.

   **D.    Opinion #3 – There is no evidence the Plaintiff suffered any economic damages as a result of PHEAA's furnishing of credit information to the credit reporting agencies.**

In her deposition, the Plaintiff testified that she suffered a variety of credit related difficulties because of an alleged error on her credit reports[14]. There is, however, no evidence supportive of these damage allegations. When you are denied credit because of information on your credit reports, including a credit score, the lender is required by law to provide the applicant with a notice of adverse action, which is more informally referred to as a declina-

---

[10] By way of example, see deposition of Dora Evans, pages 18-23, deposition of Julia Crone, pages 22, deposition transcript of Leslie Harris, pages 16, 31, 56-57, 81 and 87.

[11] See PHEAA/JONES603, 606, and 608

[12] See PHEAA/JONES-23.

[13] See PHEAA/JONES22-23, 25.

[14] See deposition of Erin Jones, page 48.

tion letter. Because Plaintiff has produced no denial letter, there is no evidence a denial ever took place, much less the reasons for such denial.

According to the Plaintiff she suffered the following credit damages;

Center BMW – The Plaintiff alleges she was denied an auto loan by Center BMW sometime in 2014[15]. There are no documents in production indicating an application or a denial took place. Should any such documents eventually be produced I reserve the right to amend this opinion. On Plaintiff's Experian credit report dated 12/21/2015 there is a credit inquiry from Center BMW dated 06/19/2014. There is nothing on this credit report that indicates any action taken by Center BMW. This is the only credit inquiry on any of the Plaintiff's credit reports for the 2-year period prior to 12/21/2015.

Pier 1 – The Plaintiff thinks she applied for a Pier 1 credit card at some unidentified point in time[16]. The Plaintiff's testimony on this matter is very unclear and indicates that she simply doesn't remember much about this Pier 1 application. There is no credit inquiry from Pier 1 on the Plaintiff's credit reports. There are no documents in production indicating an application or a denial took place. Should any such documents eventually be produced I reserve the right to amend this opinion.

Apartment deposit – The Plaintiff thinks she was asked to pay a deposit when she applied for an apartment[17]. There are no documents in production indicating an application or deposit requirement took place. There is no credit inquiry from an apartment complex on the Plaintiff's credit reports. Should any such documents eventually be produced I reserve the right to amend this opinion.

American Express – The Plaintiff believes the credit limit on her American Express card was reduced because of her credit scores but that there were no purchases she was unable to make as a result of the allegedly reduced credit limit[18]. There is no credit inquiry from American Express on the Plaintiff's credit reports. There are no documents in production indicating an application or a credit limit decrease took place. Should any such documents eventually be produced I reserve the right to amend this opinion.

Finally, if the Plaintiff was actually denied credit, asked to pay an atypical security deposit for an apartment or had the credit limit on her American Express card reduced because of information on her credit reports then it's worth noting the Plaintiff had several derogatory entries on her credit reports that have nothing to do with PHEAA.

By way of example, the Plaintiff's Experian, Equifax and Trans Union credit reports dated 09/14/2015[19] contained a considerable amount of severely derogatory entries unrelated to PHEAA.  These entries including a defaulted/charged-off Barclays Bank credit card ac-

---

[15] Ibid, page 49-50.

[16] Ibid, page 51-52.

[17] Ibid, page 54-55.

[18] Ibid, page 56-57.

[19] See Exhibit 14 to the Plaintiff's deposition, pages 7-35.

count, a Bank of America mortgage that was paid late 3 times, a second Bank of America mortgage that was reported as being 180 days past due for several years consecutive, a Central Pacific Bank account that was 180 days late at one point, and a settlement listed on a Wells Fargo auto loan or lease. Any one of these derogatory entries, and certainly the aggregate of the entries, could have led to any of the aforementioned alleged credit damages.

My opinions are based on my 25-plus years of experience and knowledge gained as a professional in the consumer credit industry, specifically as an employee or contractor of Equifax Credit Information Services, Fair Isaac Corporation, Credit.com, and Credit.com Educational Services, on my review of relevant documents produced in this matter, and as a result of my previous expert witness work, which includes more than 260 cases. All of my comments are accurate to the best of my knowledge as of the time I prepared this report. All of the opinions and comments stated in this report are expressed to a reasonable degree of professional certainty. I reserve the right to supplement or amend my opinions.

Executed this 10th day of February, 2017, in Atlanta, Georgia.

John Ulzheimer

**Exhibit A**

### John Ulzheimer

### The Ulzheimer Group, LLC, President
### 1160 Buckhead Valley Court
### Atlanta, Georgia 30324
### (404) 636-3737

John Ulzheimer, President of The Ulzheimer Group, LLC and Founder of www.creditexpertwitness.com, is a nationally recognized expert on credit reporting, credit scoring and identity theft. In addition, his expertise includes FCRA, FDCPA, CROA, credit report damages and the resulting economic damages. He serves as an expert witness/legal consultant for those involved in credit related litigation and has been qualified and admitted as an expert in Federal and State court.

John is _twice_ FCRA certified by the Consumer Data Industry Association (the trade association of the credit reporting agencies) and has 25+ years of experience in the consumer credit industry including positions with Equifax Credit Information Services (6 years), Fair Isaac, which is the inventor of the FICO® credit scoring system (7 years), Credit.com (6 years), and years of concurrent work with a number of other consumer credit related companies.

John currently is or was the credit blogger for the New York Times, Mint.com, CreditSesame.com, CreditSimple.com, CreditCardInsider.com, JD Byrider Systems, Credit.com, SmartCredit.com, VantageScore Solutions, The Simple Dollar and the National Foundation for Credit Counseling. John has been published and quoted over 3,500 times in the past 12 years on the topic of consumer credit. He has authored or created numerous educational materials on the subject including:

- The book, _The Smart Consumer's Guide to Good Credit_
- The book, _You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies._
- The consumer handbook, _Surviving Identity Theft._
- The consumer handbook, _The Get Credit Wise ToolKit_

**Relevant Experience at Equifax** – Managed consumer dispute process including consumer interview, logging consumer dispute onto credit report, communicating with data furnisher to validate credit file accuracy, modified consumer credit report according to results of investigation, and communicate dispute resolution results to consumers.

Managed relationship between Equifax and thousands of small customers, such as credit unions, car dealerships, banks, and collection agencies. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, credit scores, fraud detection services and data access software.

Managed relationship between Equifax and large strategic clients based in Jacksonville, Florida including large regional bank and national credit card issuer. Role included pricing negotiations, cross selling credit products including Credit Marketing Services, and credit scores.

**Relevant Experience at Fair Isaac** – Supported all of Fair Isaac's credit bureau based scores sold by North American credit reporting agencies; Equifax, Equifax Canada, TransUnion, TransUnion Canada, and Experian. Managed credit score pricing for several years. Well versed in credit score validations, impact analyses, score migration studies, credit scorecard development and what influences credit scores. Performed hundreds of credit score trainings to audiences of all levels of sophistication including lenders, credit bureaus, and members of Congress, consumer groups and consumers.

John frequently appears on CNBC, FOX News, CNN and NPR. He has contributed content for CNBC's "On The Money", Freddie Mac's "Know Your Score" campaign, Oprah's "Debt Diet" series and The Suze Orman Show. He is also a frequent commentator on credit-related issues in various outlets including USA TODAY, Associated Press, CNBC, NPR, Los Angeles Times, CNN, FOX, Washington Post, Money Magazine, American Banker, Wall Street Journal, SmartMoney, MarketWatch, MSNBC.com, The Motley Fool, Chicago Tribune, Bankrate.com, and other regional business and consumer media.

In his hometown of Atlanta, John is regular guest lecturer at The Westminster Schools, The University of Georgia and the Georgia Consortium for Personal Financial Literacy. Between 2004 and 2007 John taught a course on credit reporting and scoring at The Emory University Center for Lifelong Learning and was named by the students the Top Personal Finance and Investments Instructor for the 2005/2006 term. In April 2016 John began guest lecturing at Emory University's School of Law. John graduated in 1991 from The University of West Georgia with a B.S. degree in Criminal Justice.

**Certifications and Awards:**

**FCRA Certified – Consumer Data Industry Association - 2011. Perfect score on certification test.**

**Associate Credit Executive – International Credit Association. 1997.**

**FCRA Certified – Associated Credit Bureaus - 1992.**

**Consumer Credit Interviewer – Designation Conferred by Equifax as part of their employee training program.**

**Graduate – American Bankers Association School of Bankcard Management held at The University of Delaware – 2000**

**2014 Consumer Advocate Award – National Foundation for Credit Counseling.**

Expert Report of John Ulzheimer                                                    Page 18

**Exhibit B**

## Expert Testimony in the Last Four Years

*Sokiranski v Reliant Support Service* – Deposition (USDC, N Dist of OH 1:12-cv-01624)
*Cruz v Covert* – Trial (Supreme Ct of NY, Suffolk Co. Index No. 004802)
*Thompson v Wells Fargo* – Trial (Jefferson Circuit Court, Kentucky Div 2, 11-CI-04347)
*Edmondson v Flagstar Bank* – Deposition (USDC Northern Dist. of AL, 12-J-03638)
*Gardner v Gardner* – Trial (3rd Judicial Dist Ct of Salt Lake City, UT 914900261}
*Marchman v AHMSI* – Deposition (Dist Ct of Harris Co, TX 2012:09917)
*LeBourgeois v Allied Home Mortgage* – Deposition (Civil Ct, Orleans Parrish 08-2705)
*Russo v Bank of America* – Deposition, Trial (Sup Ct of San Diego, 37-2012-95724)
*Pettway v Wells Fargo* – Deposition (USDC Northern Dist of AL, 2:12-CV-03797)
*Pele v PHEAA* – Deposition (USDC East Dist of VA, 1:13CV1531)
*Davidson v Capital One* – Deposition (USDC So Dist of FL, 14-20478-CIV)
*Skagerberg v Wells Fargo* – Deposition (Dist Court of Harris Co, TX 2011-52554)
*Marchisio v Carrington Mortgage* – Deposition (USDC So Div of FL, 2:14-cv-14011)
*Noori v Bank of America* – Deposition (USDC Cent Dist of CA, cv15-01467-AB)
*Kealy v Ford Motor Credit* – Deposition (Sup Ct of CA, LA County BC497696)
*Best v Bluegreen* – Deposition (USDC So Dist of FL 14-80929-civ-cohn)
*Callaly v Lieberman Management* – Deposition (Circ Ct, Du Page Co, IL. 11L545)
*Vasquez-Estrada v Collecto, Inc* – Deposition (USDC Dist of OR, 3:14-cv-01422)
*Boydstun v US Bank* – Deposition (USDC Dist of OR, Portland Div 3:11-cv-429)
*Duell v FNBO* – Deposition (USDC So Dist of CA, 14-cv-2774)
*Daugherty v Equifax, et at* – Trial (USDC So Dist of WV, Beckley Div 5:14-24506)
*Neal v Trans Union, et al* – Deposition (USDC West Dist of MO, 6:15-cv-03474)
*Barakat v Capital One, et al* – Deposition (USDC East Dist of MI, 16-cv-10718)
*Robinson v Wells Fargo* – Deposition (USBC Southern Dist of TX, 14-03290}
*Welch v Fireman's Fund* – Deposition (Sup Ct of WA, King Co. 09-2-32462-0)

Expert Report of John Ulzheimer _____ Page 19

**Exhibit C**

## Documents Reviewed

Complaint, with Exhibits
PHEAA1-865, PHEAA1248-1258
Exhibit 14 to Jones deposition
PHEAA's Confidential Mediation Brief
Deposition transcripts of Marc Bitsko, Dora Evans, Julia Crone, Polly Snyder, Erin Jones, and
Leslie Harris
Plaintiff's First, Second, Third and Fourth Supplemental Disclosure Statements
2 pages of "Ombudsman Emails" from 2008
HIPPA Release
Plaintiff's Responses to PHEAA's First Set of Interrogatories
Plaintiff's Supplemental Responses to PHEAA's First Set of Interrogatories
Plaintiff's Responses to PHEAA's First Set of Request for Production
Plaintiff's Responses to PHEAA's Requests for Admissions
Plaintiff's Responses to Trans Union's First Set of Requests for Production
Plaintiff's Responses to Trans Union's First Set of Interrogatories
Plaintiff's Responses to Experian's Request for Admissions
Plaintiff's Responses to Experian's First Set of Requests for Production
Plaintiff's Responses to Experian's First Set of Interrogatories

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF ORANGE

3

4     At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Orange, State of California. My business
5  address is 650 Town Center Drive, Suite 1200, Costa Mesa, CA 92626-1925.

6

7     On February 10, 2017, I served true copies of the following document(s) described as **PENNSYLVANIA HIGHER EDUCATION ASSISTANCE**
8  **AGENCY'S DISCLOSURE OF EXPERT WITNESS INFORMATION**
   **PURSUANT TO FRCP RULE 26(a)(2)** on the interested parties in this action as
9  follows:

10                    **SEE ATTACHED SERVICE LIST**

11

☒     **BY MAIL:** I enclosed the document(s) in a sealed envelope or package
12     addressed to the persons at the addresses listed in the Service List and placed
       the envelope for collection and mailing, following our ordinary business
13     practices. I am readily familiar with the practice of Musick, Peeler &
       Garrett LLP for collecting and processing correspondence for mailing. On
14     the same day that correspondence is placed for collection and mailing, it is
15     deposited in the ordinary course of business with the United States Postal
       Service, in a sealed envelope with postage fully prepaid. I am a resident or
16     employed in the county where the mailing occurred. The envelope was
17     placed in the mail at Costa Mesa, California.
18

19  ☒     **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of
       the document(s) to be sent to the persons at the e-mail addresses listed in the
20     Service List. I did not receive, within a reasonable time after the
21     transmission, any electronic message or other indication that the transmission
       was unsuccessful.
22

23     I declare under penalty of perjury under the laws of the United States of
       America that the foregoing is true and correct and that I am employed in the office
24  of a member of the bar of this Court at whose direction the service was made.

25

26     Executed on February 10, 2017, at Costa Mesa, California.

27

28     _____
       April M. Yusay

MUSICK, PEELER
& GARRETT LLP
ATTORNEYS AT LAW

1031417.1                          3                    Case No. 2:16-cv-00107 RSWL (AFMx)
PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY'S DISCLOSURE OF EXPERT WITNESS
INFORMATION PURSUANT TO FRCP RULE 26(a)(2)

1

## SERVICE LIST

2

3   Stuart Price                                       David A. Chami
    PRICE LAW GROUP, APC                               PRICE LAW GROUP, APC
4   15760 Ventura Boulevard, Suite 800                 1204 E. Baseline Road, Suite 102
    Encino, CA  91436                                  Tempe, AZ  85283
5   Phone:  (818) 907-2030                             Phone:  (866) 881-2133
    Fax:      (818) 205-3730                            Fax:      (866) 401-1457
6   Email: Stuart@PriceLawGroup.com                    Email: David@PriceLawGroup.com
7   *Attorneys for Plaintiff*                          *Attorneys for Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

1031417.1                                      4                Case No. 2:16-cv-00107 RSWL (AFMx)
PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY'S DISCLOSURE OF EXPERT WITNESS
                            INFORMATION PURSUANT TO FRCP RULE 26(a)(2)